2001-NMSC-020

27 P.3d 972

**In the Matter of Dan E. SHEEHAN, Esq., An Attorney Licensed to Practice Before the Courts of the State of New Mexico.**

**No. 26,871.**

Supreme Court of New Mexico.

July 27, 2001.

Sally Scott–Mullins, Deputy Chief Disciplinary Counsel, Albuquerque, NM, for the Disciplinary Board.

Dan E. Sheehan, Clovis, NM.

## OPINION

### PER CURIAM.

{1} This matter came before the Court upon recommendation of the disciplinary board to approve a conditional agreement admitting allegations and consent to discipline tendered by respondent, Dan E. Sheehan, pursuant to Rule 17–211 NMRA 2001 of the Rules Governing Discipline. We adopt the recommendation and hereby place respondent on deferred suspension for a minimum period of at least three years for his violations of the Rules of Professional Conduct.

{2} This matter concerns the perils inherent in representing family or close friends, and more specifically, of permitting those relationships to take precedence over the lawyer's adherence to ethical obligations. It also demonstrates that, although certain discipline may be customarily imposed for violations of certain provisions of the Rules of Professional Conduct, the facts of a specific case may make a different resolution appropriate. *In re Zamora*, 2001–NMSC–011, 130 N.M. 161, 21 P.3d 30. Typically, an attorney's failure to appropriately safeguard funds belonging to a client or third party—a violation of Rule 16–115—will result in the most serious discipline. *See, e.g., In re Kelly*, 119 N.M. 807, 896 P.2d 487 (1995) (disbarment appropriate sanction for wilfully taking funds from trust account). Precedent also exists for the imposition of lesser sanctions. *See, e.g., In re Camacho*, 106 N.M. 296, 742 P.2d 508 (1987) (lack of evidence of dishonest motives in commingling personal funds with client funds and writing NSF check on trust account resulted in imposition of deferred suspension with probation). The facts of this case place it in the latter category of discipline.

### I. Factual Background

{3} Respondent had known the subject client since he was a boy; she was a family friend and became a close friend of his. They maintained a close relationship until she became mentally incompetent in the early 1990's. Respondent was primarily responsible for the client's care and finances from the time her health began to wane until she was moved from her home to a nursing home shortly before her death in 1996. Respondent not only handled the irrevocable trust involved in this disciplinary proceeding, but also her personal business, rather extensive investments, and medical care. The client's two grown daughters neither lived in New Mexico nor visited her frequently.

{4} Testimony at the hearing on the proposed consent agreement revealed that until her mental capacities diminished, the subject client was a strong-minded and capable businesswoman. As long as she was able, the client made all decisions on her personal business and respondent carried them out. Respondent's loyal compliance with her directives served to bring him before this Court today. The client's directives were at times inconsistent with respondent's duties as a licensed attorney. No lawyer has the luxury of following such directives, no matter how well-intentioned they may be and no matter how close the lawyer is to the client.

### II. Safeguarding Client Funds

{5} Each of the client's daughters had one child. In 1982, the client established an irrevocable trust for the benefit of the two grandchildren. Respondent was named trustee for the irrevocable trust and essentially served as the only trustee, although the trust instrument provided for a co-trustee. The initial co-trustee, who was the client's cousin, declined to serve; the replacement trustee named in the instrument was never appointed.

{6} The trust instrument provided for two equal trusts, one to benefit each grandchild. Separate trusts were never formed, and respondent distributed almost $30,000 more to her grandson than he did to her granddaughter. The evidence revealed no sinister motive in the disparity; rather, it appears to have been a case of the squeaky wheel getting the grease. The trust instrument called for annual accountings; respondent prepared only one in more than ten years of serving as trustee. In addition, respondent made improper disbursements of trust funds and failed to properly document loans made from trust funds.

■ {7} Respondent's failure to properly disburse trust funds in accordance with the trust instrument violated Rule 16–115(A), as did his failure to produce annual accountings and document trust loans. Although Rule 16–115(A) customarily addresses attorney trust account issues, its scope is not so limited. The rule speaks of the property and funds of clients and third persons; it is broad enough to cover any circumstance in which a lawyer is in possession of client or third party funds in a fiduciary capacity. *See, e.g. In re Hartley,* 107 N.M. 376, 758 P.2d 790 (1988) (while serving as Treasurer for the State of New Mexico, attorney embezzled funds from regional treasurers' association, which resulted in imposition of indefinite suspension).

{8} During the years he served as trustee, respondent also performed legal services for both of the client's daughters at her request and direction. Limited services were provided to one daughter; far more extensive services were provided to the other, including the dissolution of one cattle company and the formation of another, as well as significant services for the newly-formed company. As the grandson testified in a lawsuit filed against respondent in 1996 by the granddaughter, respondent was viewed as the "family lawyer."

{9} In the middle 1980's, the cattle company owed respondent almost $30,000 in legal fees and was unable to pay. Acting at the client's direction, respondent withdrew funds from the trust to pay these fees. Respondent labeled these withdrawals as "loans" from the trust to himself. The "loans" were not documented other than with notations on the memo line of the disbursement checks. In addition to the fact that this was an irrevocable trust that the trustor-client had no right to control, New Mexico law specifically prohibits a trustee borrowing from the trust he or she serves. *See* NMSA 1978, § 46–2–3 (loan of trust funds).

{10} By "loaning" trust funds to himself, respondent violated Rule 16–115(A) by failing to appropriately safeguard funds belonging to third persons. Notably, however, a loan to the daughter's cattle company would not necessarily have been improper, if properly documented and secured, even if the loan proceeds were utilized to pay respondent's legal bills. The fact that respondent characterized these disbursements as "loans" to himself, proves his misconduct, but not a finding of misappropriation or conversion.

### III. Conflict of Interest

{11} Respondent testified that at the time he performed legal services for various family members, he did not view their interests as being adverse and did not think his representation would adversely affect his relationship with any of these parties. Rule 16–107 governs conflict of interest issues involving contemporaneous clients. Such representations are prohibited under Subsection A if the interests of the clients are directly or substantially adverse unless two conditions are met: (1) the lawyer must reasonably believe the representation will not adversely affect the relationship with the other client and (2) each client must consent after an explanation of the advantages and risks involved. Because respondent did not believe the representations were adverse, no consultations were given.

■ {12} This is an area in which a lawyer should not simply rely on instinct to comply with ethical obligations. The determination of whether a conflict exists requiring that the Rule 16–107(A) conditions be met prior to proceeding with the representation is an objective standard. The fact that an attorney failed to consult with the clients and obtain consent because he or she did not believe the interests were directly or substantially adverse is not a defense to a conflict of interest charge. Careful analysis and erring on the side of caution in these situations is recommended. Respondent did neither when he followed his client's directive to pay the cattle company's legal bills from the trust, and, in turn, his conduct constituted a violation of Rule 16–107(A).

{13} Under Rule 16–107(B), a lawyer is prohibited from representing a client if the representation may be materially limited by the lawyer's own interests or responsibilities to another client or person, unless the same two conditions are met. Respondent violated

this rule because the discharge of his fiduciary duties to the trust was limited by his own interest in being paid for the substantial legal work he had done for the daughter's cattle company, as well as by his loyalty and obedience to his client's directives.

## IV. Fees

{14} A second count of the charges filed against respondent addressed his billing practices for services provided to the subject client. Respondent's billing statements are available only for the period from 1993 to 1996 and show that respondent consistently charged the client legal fees for services that were predominantly nonlegal in nature, in addition to fees for the legal services he provided to her. Respondent charged $100 per hour for such services as taking the client to the doctor, talking to her care providers, and taking her to the pharmacy. Utilizing the client's power of attorney, respondent disbursed her funds to pay himself for these nonlegal services at his customary hourly rate as a lawyer, thus violating Rule 16–105(A), by charging an unreasonable fee by charging at lawyer rates for nonlegal services.

{15} This latter misconduct must be placed into the perspective of the facts of this case, however, which suggest that the client sought ways to share her largess with respondent. Three witnesses testified to the closeness of the bond between the client and respondent and the devotion with which respondent acted in her interest. One witness was the client's caretaker from 1986 until she was moved to a nursing home in 1995, who testified, as did two other witnesses, that until the client became mentally incompetent she made the decisions on her personal business after consulting with respondent. The caretaker also testified that respondent was always there when she needed him to help with the client's care, no matter what time of day or night.

{16} Another witness, an attorney who prepared the client's estate documents as well as the trust instrument, testified that when he prepared a will for the client in 1986, she wanted to give her automobile to respondent and bequeath one-fifth of certain mineral interests to him. According to this witness, respondent's client stated that she wanted to make this bequest because of the personal attention and care respondent had given her and because he had helped her accumulate assets and manage them. The attorney witness testified that respondent declined the bequest. In 1988, respondent's client returned to the attorney witness for a new will and again wanted to include respondent, this time by leaving part of a farm to him; again, respondent refused the bequest. Declining the client's bequest did not authorize respondent to charge her at lawyer rates for non-lawyer services, nor did it support respondent's testimony that the fees were made pursuant to an agreement between him and his client permitting him to provide personal care to her and permitting her to reward him for his care and devotion.

{17} Respondent testified that he and his client agreed that he would charge her at his regular hourly rate for anything he did for her during business hours. The existence of such an agreement is supported by the fact that respondent did not charge the client for the many hours spent caring for her outside of regular business hours. We also note that if it had been necessary to pay someone to do what respondent did for his client during business hours, a significant expense would likely have been incurred. It is unlikely, however, that such charges would have been as much as respondent's charges billed at his regular hourly lawyer rate.

{18} The agreement concerning charges for time spent during the work day vitiates, at least in part, respondent's practice of charging the client at lawyer rates for nonlegal work. A better practice would have been if the agreement were documented and the nonlegal work were not billed as lawyer time. The reader should not misconstrue this opinion as suggesting that this Court will accept an undocumented claim to the existence of such a compact. Only because the evidence in this matter substantiates respondent's version of his billing agreement with the client do we view respondent's billing practice as an excessive fee violation rather than a sinister act deserving of more severe sanction.

{19} In the mid–1990's, the subject client's family became more involved and critical of respondent's actions, especially the high cost of maintaining the client in her home.[1] The family's concerns led to respondent's resignation as trustee and a 1996 lawsuit being filed against him by one of the daughters as trust beneficiary. In early 1999, while that lawsuit was pending, and with the costs of his defense mounting, respondent filed bankruptcy; an objection to discharge from the daughter followed. In May 1999, respondent suffered a blockage of the abdominal aorta that almost cost him his life. He was hospitalized for several weeks and then required extensive rehabilitation. In December 1999, respondent entered into an agreed judgment in favor of the daughter in the approximate amount of $30,000.

{20} In February 2000, respondent was hired by the public defender department. His supervisor testified at the hearing on the consent agreement that respondent was an exemplary employee and recently had been promoted. Respondent has declared his intention to remain employed as a public defender for the foreseeable future.

## V. Imposition of Discipline

{21} Respondent cooperated throughout the disciplinary process, candidly admitting his wrongdoing and expressing remorse. Respondent has been practicing law for almost thirty years and has not been previously disciplined. These are appropriate factors to consider in mitigation. *See ABA Standards for Imposing Lawyer Sanctions,* § 9.32(a), (e) and (*l*) (1991 as amended in Feb. 1992). Respondent's cooperation extended to agreeing to discipline which, under the circumstances of this case, persuades this Court that the public will not be endangered by his continued practice of law. Most significantly, respondent must make minimum payments of $400.00 per month on the judgment obtained against him by the client's daughter as trust beneficiary. He also agreed that, throughout the three-year period of deferred suspension, he will not prac-

tice in a setting in which he has access to or control over a trust account or funds belonging to clients or third persons, or serve as the trustee of a trust. Respondent has further agreed that throughout the remainder of his legal career, should he wish to serve as a trustee (an interest he emphatically disavows), he will notify the office of disciplinary counsel and comply with any requirements established for serving in that capacity. These restrictions on respondent's practice, coupled with the particular facts of this case, respondent's lack of a prior disciplinary record, and his exemplary performance as a public defender, convince us that the legal profession, the legal system, and the public will be well served by the imposition of the discipline provided in the conditional agreement admitting allegations and consent to discipline. *See Preface to Rules Governing Discipline* (purpose of discipline is protection of public, the profession, and administration of justice, not punishment of person disciplined).

{22} Now, therefore, it is ordered that the recommendation of the disciplinary board hereby is adopted and the conditional agreement not to contest and consent to discipline hereby is approved;

{23} It is further ordered that Dan E. Sheehan hereby is suspended from the practice of law pursuant to Rule 17–206(A)(3) NMRA for a minimum period of at least three years;

{24} It is further ordered that the entire period of suspension shall be deferred and respondent shall be placed on unsupervised probation;

{25} It is further ordered that respondent shall satisfy the following terms and conditions during the period of probation:

(1) Respondent shall observe all Rules of Professional Conduct and Rules Governing Discipline;

(2) Respondent shall attend and successfully complete a seven-hour "Ethics School" presented by the Colorado Supreme Court Office of Regulation Counsel,

---

1. The caretaker testified that respondent's client told her not to ever put her in a nursing home because she wanted to remain in her own home.

and provide documentation to disciplinary counsel of his successful completion of the course;

(3) Respondent shall not practice in a setting in which he has control over or access to a trust account or funds belonging to clients or third persons;

(4) Respondent shall notify disciplinary counsel of any change in his employment status within two weeks of the effective date of such change;

(5) If, after his retirement from probationary status, respondent practices in a setting in which he has access to trust funds, he shall notify disciplinary counsel within two weeks and submit to and bear the expense of an audit of the trust account within one year of such notice. The audit shall be conducted at a time and by auditors selected or approved by disciplinary counsel; and

(6) Beginning January 2001, respondent shall make payments of no less than $400.00 each month in satisfaction of the judgment entered December 13, 1999, by the United States Bankruptcy Court for the District of New Mexico, for $29,792.79, with interest at the rate of eight and seventy-five one hundredths percent (8.75%) per annum, in favor of the daughter as trust beneficiary. Throughout the term of the deferred suspension, respondent shall furnish a copy of each monthly payment along with proof of mailing to disciplinary counsel.

{26} It is further ordered that respondent shall pay the costs of this disciplinary proceeding in the amount of $573.50 on or before June 15, 2001, with interest to accrue at the rate of eight and one-half percent (8½%) per annum on any unpaid balance as of June 15, 2001. Said costs shall be reduced to a transcript of judgment and payment of costs shall be deemed a condition of probation;

{27} It is further ordered that at the conclusion of the probationary period, respondent shall comply with the requirements of Rule 17–214(H) concerning reinstatement from probation; and

{28} It is further ordered that should respondent fail to satisfy any condition or requirement of probation, disciplinary counsel shall notify this Court by filing a show cause motion pursuant to Rule 17–206(G) NMRA 2001.

{29} It is so ordered.